**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **HELEN Y. MILLER** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER: 11-275-JJB-DLD** |
| **MICHAEL J. ASTRUE, Commissioner**<br>**of Social Security** | |

### MAGISTRATE JUDGE'S REPORT

Plaintiff seeks judicial review of a final decision of the Commissioner denying her claim for disability insurance benefits. In making that final decision, the Commissioner reached the fourth step of the five-step sequential disability analysis set forth in 20 C.F.R. § 404.1520(b)-(f)& § 416.920(b)-(f).[1] The Commissioner determined that plaintiff had the following severe impairments: degenerative disc disease and hypertension, but that these impairments did not prevent her from performing her past relevant work as a dispatcher.

### *Background*

Plaintiff protectively filed an application for benefits on March 31, 2009, alleging a disability onset date of January 15, 2009, due to back problems, severe pain, and problems sitting or standing for long periods of time. (TR 119). The claim was initially denied on May 12, 2009. Plaintiff filed a timely request for hearing; a hearing was held on February 3, 2010; and an unfavorable decision was rendered on March 11, 2010, finding that plaintiff was not disabled from January 15, 2009, through the date of the decision. Plaintiff appealed the ALJ's decision, and the Appeals Council declined to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.

---

[1] *See,e.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

*Background*

At the time of the February 3, 2010, hearing, plaintiff was 44 years old, had a 12th grade education, some training as an auto mechanic, and past relevant work as a cashier, cook, dispatcher, and machine operator. Plaintiff alleged that she suffers from "hypertension, degenerative changes of the right knee with tendinosis (sic); multilevel degenerative disc disease (DDD) of the lumbosacral spine with disc herniation, disc bulging, facet arthrosis with narrowing of neural foramina, retrolisthesis, and disc space narrowing, causing neuropathy, radiculopathy, sciatica, neurogenic bladder, and chronic back pain." (rec.doc. 13-2, pg 3)

The relevant medical history in this matter begins with plaintiff's December 18, 2008, visit to Dr. Mario Kakazu in the emergency room of Lallie Kemp Hospital. Dr. Kakazu's clinical impression was that plaintiff suffered from chronic low back pain, with decreased range of motion ("ROM") and muscle tenderness. Dr. Kakazu noted that plaintiff's gait was steady, and he did not examine plaintiff with regard to motor or sensory loss. The lumbar spine x-ray taken at the same visit found a "minimal grade I retrolisthesis of L4 on L5," "disc space narrowing at L5/S1," and no acute abnormality. She was prescribed Naproxen and Flexeril and advised to follow-up with her primary care physician. (TR 163-169)

Plaintiff next saw a nurse practitioner, Melissa Ray, at St. Helena Community Health Center, on January 16, 2009. Plaintiff reported that she was advised her x-ray showed arthritis only; her back pain was not improving; and she was experiencing right leg radiculopathy with some weakness and pain with standing and weight bearing. (TR 182) The nurse practitioner found plaintiff was not in acute distress, but was guarding her back and not moving, and "crying gently with movement." Id. The physical examination noted

tenderness, pain, visible muscle spasms on right LS paravertebral region, strength 3-4/5 due to pain, no costovertebral angle tenderness, and a positive straight leg raise at 60 degrees on the right side. No sensory exam abnormalities or peripheral neuropathy were noted, although the motor exam revealed the decreased strength and her gait consisted of an abnormal limping on the right leg. The nurse practitioner assessed plaintiff with lumbago and thoracic neuritis in addition to benign essential hypertension. (TR 183)

Plaintiff returned to the nurse practitioner on January 23, 2009, where she reported an improvement in her back pain. The nurse practitioner found that her sensory and motor examinations were normal, her gait was normal, and her reflexes were normal. Also, the examination of plaintiff's back revealed some tenderness on palpation over right SI joint and the same positive straight-leg test, but no muscle spasms. The nurse practitioner assessed plaintiff with lumbago and benign essential hypertension. (TR 180-181)

Plaintiff underwent a lumbar spine MRI on February 10, 2009, which revealed a posterior herniation of the L4-5 disc, posterior bulging of the L3-4 disc, and lumbar facet arthrosis with relative narrowing of the right and left L4-5 neural foramina. (TR 186) Plaintiff then returned to the nurse practitioner on February 18, 2009, who determined that plaintiff's sensory and motor examinations were normal and her reflexes were normal. While there were no muscle spasms, plaintiff again was guarding her back and limping on her right leg although her balance also was normal. The tenderness and pain upon palpitation remained the same, and plaintiff was in no acute distress. (TR 172-173)

Plaintiff returned to the nurse practitioner on March 9, 2009, March 26, 2009, and April 20, 2009, where the only changes in her condition were due to knee joint pain and bursitis, along with one bilateral positive straight leg raise test at the March 9, 2009, visit.

(TR 179)  With regard to the April 20, 2009, visit, plaintiff complained of knee pain, but not of back pain, and no examination of her back occurred.  (TR 175-176)

On April 28, 2009, plaintiff self-reported that her activities of daily living included that she woke up at 6:30 a.m., took her medication and ate breakfast, laid down until 10:00 a.m., then went next door to her mother's house to "hang out with her" until her mother went to work at 1:30 p.m.  She spent time watching television, napping, and cooking small meals for herself daily. She reported doing her own laundry, but had a "little problem putting clothes in dryer," and "trouble sweeping, but she estimated that her household chores took her about 2 hours a week to complete.  (TR 132-133) She drives, but stated that if it were a long distance drive, then her mother drove her.  She was able to shop for groceries and medication in stores once a month.  There were no changes in her social activities before her back began hurting her, as she said, "I really didn't go too many places before my back started to hurt bad I worked a lot."  (TR 135-136) She reported she could lift 8-10 pounds, walk 40 feet before needing to rest for 30 seconds, and could follow written and verbal instructions "very well." Id.  The only aids she used were glasses prescribed in 2007.

On May 11, 2009, plaintiff underwent the Physical Residual Functional Capacity Assessment (RFC), which determined plaintiff was capable of performing light work with some limitations in climbing, stooping, kneeling, crouching, and crawling. [2]  (TR 291)

---

[2] The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.
    'Frequent' means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying
(continued...)

On May 26, 2009, plaintiff went to the Bogalusa Medical Center where she was seen by a licensed practical nurse ("LPN"), "A. Passman," who noted that plaintiff was ambulatory and performed activities of daily living (ADL's) independently. (TR 262) While the record reflects that plaintiff reported her back pain as 8/10, the record is devoid of any assessment, examination, or treatment at this visit.

Plaintiff returned to the nurse practitioner at Southeast Community Health Systems on June 11, 2009, and the record indicates that she was "not feeling tired or poorly," and was experiencing the same tenderness on palpitation and pain on flexion. Plaintiff had a positive straight leg raise test, but her sensory and motor functions were not tested. The report also indicates that plaintiff was non-compliant with her hypertension medication. (TR 246) On July 14, 2009, a physical therapist noted in her report that she provided physical therapy to plaintiff between June 16, 2009, and June 24, 2009, which "worsened her symptoms." The physical therapist opined that plaintiff "may be a surgical candidate, and that placing her on disability should be considered." (TR 205)

Plaintiff next saw the licensed practical nurse at Bogalusa Medical Center on July 28, 2009, where it was again noted that plaintiff was ambulatory and performed her ADL's independently. (TR 258) An EMG (electromyogram) indicated lower extremity peroneal and post tibial neuropathies and right S1 radiculopathy (mild). (TR 258-261)

---

[2](...continued)
requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work."  SSR 83-10: TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK -- THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2.

Plaintiff returned to the nurse practitioner on August 24, 2009, complaining of low back pain on the left side radiating down her hip and leg, but stated that Lyrica helped her pain. She appeared to be in no acute distress with no muscle spasms, and the nurse practitioner assessed her condition as "backache" and "benign essential hypertension." (TR 240-242) Plaintiff returned to the nurse practitioner on October 6, 2009, complaining of "localized pain to right lower back and to right lateral hip." (TR 239) She was assessed with sciatic neuritis, and restarted on Lyrica. (TR 243) The nurse practitioner noted that the EMG conducted by Bogalusa Neurology "was not completed," and patient requested a transfer to Earl K. Long neurology. *Id.* On October 12, 2009, plaintiff went to the emergency room of Lallie Kemp Hospital, and the nurse practitioner's clinical impression was that plaintiff suffered from acute sciatica on the right side and Demerol and Phenergan were prescribed. (TR 216-217)

On November 18, 2009, plaintiff saw Dr. Oscar Pereda for the first time, complaining of "severe lower back pain with pain radiating down right leg." She was prescribed Neurontin for 30 days, and the only physical findings contained in the record were her vital signs. The progress notes also stated that "pt needs forms filled out for disability," (rec.doc. 38), and Dr. Pereda completed a "Physical Capacity Evaluation" form (TR 237) at that visit, wherein he determined plaintiff could stand, walk, or sit less than one hour out of an eight-hour workday; could not use her hands for repetitive grasping, could not lift more than ten pounds, and could not tolerate any stress. (TR 199-202) Plaintiff next saw Dr. Pereda on December 4, 2009, following a slip-and-fall in the shower wherein she injured her left knee. (TR 235-236)

6

On December 9, 2009, plaintiff was seen by Earl K. Long's neurology department, complaining of lower back pain and weakness. Her motor strength was 4+/5 with "intermittent effort," and "no evidence of lumbosacral radiopathy or upper or lower motor neuron syndrome." The notes indicate that while the EMG was "supportive of polyneuropathy," there were "no physical symptoms." Her sensations were intact and her reflexes were normal, and she was advised to continue the Neurontin and to return in four months for follow-up. (TR 254)

## *GOVERNING LAW*

In reviewing the Commissioner's decision to deny benefits, the Court is limited to a determination of whether the Commissioner's decision was supported by substantial evidence existing in the record as a whole and whether the Commissioner applied the proper legal standards. *E.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision does exist, but the Court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment for the Commissioner's even if the evidence preponderates against the Commissioner's decision. *Id*. Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion. *Id*. A finding of "no substantial evidence" will be made only where there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position. *Id*.

The overall burden of proving disability under the Social Security Act rests on the claimant. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). If the claimant proves that

7

she no longer is able to work in her past relevant work, then and only then does the burden shift to the Commissioner to establish that the claimant nonetheless has the ability to engage in other substantial gainful activity.  *E.g., Rivers v. Schweiker*, 684 F.2d 1144, 1155-1156 & n.14 (5th Cir. 1982). Thus, in cases such as this one where the Commissioner determines that the claimant is capable of performing her past relevant work and accordingly reaches only the fourth step of the five-step disability sequential analysis, the burden of persuasion remains with the claimant to show an inability to return to her past relevant work.

## *ISSUES*

The issue before this Court is whether the Commissioner's finding that Helen Y. Miller is not disabled is supported by the substantial evidence and was reached by applying the proper legal standards.  42 U.S.C. § 405(g).

Plaintiff argues for either reversal or remand based on the following grounds:

1) The ALJ's determination that her back impairments do not meet or medically equal Listing 1.04 is unsupported by substantial evidence and contrary to *Audler v. Astrue*, 501 F.3d 446 95th Cir. 2007);

2) The ALJ's determination that she had the residual functional capacity to perform sedentary work with limitations is unsupported by substantial evidence and contrary to *Carry v. Heckler*, 750 F.2d 479 95th Cir. 1985) and *Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000); and

3) The ALJ failed to accord the treating physician's opinions controlling, or at least significant, weight is unsupported by substantial evidence and contrary to *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000)*; Loza* at 378; *Fruge v. Harris,* 631 F.2d 1244 (5th Cir. 1980); 20 C.F.R 404.1527(d) and 416.927(d) (2010); and SSR 96-2p.

## *DISCUSSION AND ANALYSIS*

### *Issue 1 - Substantial Evidence and Listing Criteria*

Plaintiff argues that the substantial evidence supports her claim for disability. Plaintiff argues that the ALJ did not discuss the evidence and explain how he reached his conclusion regarding plaintiff's failure to meet or medically equal Listing 1.04. Plaintiff also argues that the ALJ mischaracterized the Listing 1.04 criteria when he opined that bilateral positive straight leg tests were required, and that his subsequent finding of non-disability therefore was not based on evidence of record, was not harmless, and was contrary to *Audler.* The court disagrees.

A plaintiff "must provide medical findings that support each of the criteria" of a listed impairment. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) Listing 1.04 states, in pertinent part:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . .

In this case, plaintiff asserts that her back impairments meet all the criteria of Listing 1.04, but a review of the medical evidence reveals there is substantial evidence to support the Commissioner's decision to deny disability. For example, the records reflect that while plaintiff's physical examinations occasionally showed slight motor loss, it was not

accompanied by either sensory or reflex loss. Plaintiff's argument is completely bereft of any analysis that relates the very precise requirements of the Listing to her own personal medical situation. While plaintiff cited to multiple visits, she completely failed to reconcile the normal sensory and reflex findings in those visits with the requirements of Listing 1.04.

Further, Listing 1.04 requires positive straight leg raise tests in both the sitting and supine positions, and the record is devoid of any evidence that the few positive straight leg raise tests conducted on plaintiff occurred in both the sitting and supine positions. Plaintiff does not address this criteria of Listing 1.04, and instead argues that because the ALJ misstated the criteria as requiring *bilateral* positive straight leg raising tests, his determination therefore was not based on the evidence. While it is true that Listing 1.04 does not require bilateral positive straight leg raising tests, the ALJ's error was a harmless one as procedural perfection in social security administrative proceedings is not required, and the substantial rights of the plaintiff were not affected simply because the ALJ misstated one criteria of the Listing. The ALJ clearly considered the record evidence, and addressed this evidence in great detail, noting, *e.g.,* that after plaintiff's December, 2009, visit to the neurology clinic, "no further curative treatment was recommended;" no physician has suggested the claimant undergo surgical repair of her lumbar spine;" and there was no evidence of lumbosacral radiculopathy and no sign of upper or lower motor neuron syndrome in the EMG study. Also, the ALJ discussed how plaintiff's back impairment "began suddenly in December 2008," but was much improved within 12 months in that by October 2009, she was no longer experiencing radiculopathy, and opined that plaintiff's testimony "reveals that her back pain may be exacerbated by various falls she experienced after the alleged onset date," but that the medical records do not show that her falls "are

10

a result of any medically determinable impairment." (TR 21) In this case, while plaintiff may have exhibited some of the Listing 1.04 criteria; she did not exhibit motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss or positive straight-leg raising tests in both the supine and sitting position that was present for a period of twelve continuous months. Plaintiff cites to no authority that a plaintiff may meet some of the criteria and presumptively found disabled. The court accordingly will not reverse the decision based on this ground. *Accord Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988)

### *Issue 2 - The RFC Assessment*

Residual functional capacity ("RFC") is an assessment by a state agency medical consultant of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule. *Myers v. Apfel*, 238 F.3d 617, 620 ( 5th Cir. 2001), *citing* SSR 96-8p. Plaintiff argues that the ALJ's finding of a sedentary RFC with limitations is erroneous because the ALJ mischaracterized plaintiff's activities of daily living, improperly considered her subjective complaints of pain, and failed to consider the objective medical evidence and medication side effects. Plaintiff's arguments are without merit.

The Fifth Circuit has held that the Commissioner may consider evidence of participation in daily activities and household chores in conjunction with other evidence when determining disability. *Reyes v. Sullivan*, 915 F.2d 151, 154-55 (5th Cir. 1990). Plaintiff testified she can walk at least 40 feet and then must rest for 30 seconds; is able to lift eight to ten pounds; and can sit for one hour if she can move around, and stand for

15 minutes at a time. (TR 21) As discussed earlier, plaintiff self-reported that she can do her own laundry, although placing items in the dryer was a "little problem;" she shopped for her own groceries, and her household chores took her about 2 hours a week. (TR 132-136)

With regard to plaintiff's assertion that the ALJ did not properly consider her subjective complaints of pain, it is well noted that allegations of pain must be corroborated by objective medical evidence. *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991); *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). In judging a claimant's credibility, the ALJ can consider such things as medical reports, the claimant's daily activities, and the medications the claimant is taking. *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991). "The ALJ must weight the objective medical evidence and assign articulated reasons for discrediting the claimant's subjective complaints." *Pineda v. Astrue*, 2008 WL 3341022 (C.A. 5. (Tex.)); *Falco v. Shalala*, 27 F.3d 160, 163. (5th Cir. 1994).

In this case, the medical evidence did not indicate a basis for the magnitude of the pain alleged by plaintiff. The ALJ detailed the evidence he considered, and specified the relevant factors as outlined in the case law and regulations which he used to assess the credibility of plaintiff's statements. The ALJ also noted he gave her "the benefit of some doubt as to subjective complaints not very well supported in the records," in assigning the sedentary RFC, instead of the original light RFC, and specifically noted that the relatively recent onset of the alleged impairments, combined with the "longitudinal medical record indicative of improvement, suggests that the claimant should, with continued treatment, soon regain a residual functional capacity about the sedentary level." Thus, the ALJ properly evaluated the intensity and persistence of plaintiff's alleged symptoms, including her subjective complaints of pain, and considered the medical evidence when he accorded

limited weight to plaintiff's complaints of disabling pain, and succinctly articulated his reasons for doing so. Also, in the absence of uncontroverted medical evidence which shows a basis for a claimant's pain, the ALJ's "evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence." *James v. Bowen*, 793 F.2d 702, 706 (5th Cir.1986).

*Issue 3 - Treating Physicians & Their Opinions*

Plaintiff argues that the opinion of Dr. Pereda is entitled to controlling weight as a treating physician, and that the ALJ did not show good cause when he discounted or rejected Dr. Pereda's opinion, contrary to the Regulations. In response, the Commissioner argues that Dr. Pereda was not a "treating physician" and therefore it was not error for the ALJ to deny controlling weight to Dr. Pereda's opinion. The ALJ's decision indicates that he accorded little weight to Dr. Pereda's opinion because he treated plaintiff for a short time, his opinion was not consistent with the records or plaintiff's own testimony; was non-specific as to the "onset and likely duration of the limitations he perceived," and the opinion was rendered "as a series of check-marks with only cursory narrative support" with "no specific reference to medical signs, symptoms, and laboratory results." (TR 22)

As the plaintiff has identified Dr. Pereda as her "treating physician," and as such, his opinion was entitled to controlling, or at least significant weight, the first issue for the court to determine is if Dr. Pereda indeed was plaintiff's treating physician. Generally speaking, a treating physician is a physician who has seen a patient "a number of times and long enough to have obtained a longitudinal picture" of the plaintiff's impairment. 20 CFR §404.1527. In other words, treating physicians provide some kind of continuous care. Also, other factors to be considered include the "nature and extent of relationship, support

13

provided by other evidence, consistency of opinion with record, and specialization." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)

In *Taylor v. Astrue*, 245 Fed. Appx. 387, 391 (5th Cir. 2007), the court found that Taylor visited a physician twice over the course of four years, and determined that the physician was not a treating physician given the limited treatment relationship Taylor established with that physician. Similarly, the court in *Hernandez v. Heckler*, 704 F.2d 857, 860-61 (5th Cir. 1983), found that Hernandez visited his physician twice in a 17-month period, and therefore that physician also was not a treating physician.

In this case, it is undisputed that plaintiff saw Dr. Pereda on only two occasions. On the first occasion, plaintiff saw Dr. Pereda in order to obtain a completed "Physical Capacity Evaluation" form. (TR 237). On the second occasion, plaintiff saw Dr. Pereda due a fall and subsequent left knee injury. Further, Dr. Pereda's notes of that visit do not indicate that he reviewed any other physicians' reports or diagnostic studies. There is nothing in the record which indicates plaintiff saw Dr. Pereda frequently or long enough for Dr. Pereda to provide a longitudinal picture of plaintiff's impairments; thus, Dr. Pereda cannot be considered a "treating physician" under the Regulations.

Assuming *arguendo*, however, that Dr. Pereda was plaintiff's treating physician, plaintiff argues that the ALJ erred when he did not recontact Dr. Pereda for a clarification of his opinion; however, an ALJ need only seek clarification or additional evidence from the treating physician if the ALJ determines that the treating physician's records, while not directly controverted, are inconclusive or otherwise inadequate. *Newton v. Apfel*, 209 F. 3d 448, 455 (5th Cir. 2000). In this case, however, Dr. Pereda was not a treating physician, and his records were not inconclusive or inadequate. Furthermore, they were controverted

14

directly by the other record evidence. Therefore, the ALJ was not required to seek additional evidence or clarification from Dr. Pereda. Further, again assuming *arguendo* that Dr. Pereda was a treating physician, the ALJ still was within his discretion to reject Dr. Pereda's opinion without a detailed analysis[3] because that detailed analysis is only required in the absence of competing first-hand medical evidence. *Newton*, at 456- 458.

Here, the ALJ discussed at length the competing first-hand medical evidence, and specifically stated that Dr. Pereda's opinion departed "significantly from the vast majority of the medical records, and is highly inconsistent with the actual laboratory tests and medical findings" as "opposed to forms completed for purposes other than diagnosis and treatment." (TR 23) Also, the Commissioner acts well within his discretion when he discounts an opinion of a treating physician that is only conclusory in nature without any supporting clinical or laboratory findings. *Scott v. Heckler*, 770 F.2d at 485 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 621 ( 5th Cir. 1983); *Oldham v. Schweiker*, 660 F. 2d 1078, 1084 (5th Cir. 1981). Furthermore, an ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Bradley v. Bowen*, 809 F. 2d 1054, 1057 (5th Cir. 1987). In the present matter, a review of the record as a whole shows that the ALJ acted within his discretionary boundaries with respect to the weight he assigned to Dr. Pereda's opinion. In the final analysis, conflicts in the medical evidence are to be resolved by the Commissioner, not by the courts. *E.g., Oldham*, 660 F.2d at 1084. Plaintiff's arguments in this regard are without merit.

---

[3]Detailed analysis" refers to the six factors set forth in § 404.1527(e) and explicitly applies only to medical opinions, not disability opinions, as those opinions are reserved for the Commissioner. See *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003); 1920 C.F.R. § 404.1527(d)(2); SSR 96-2p.

Therefore, although the ALJ did not reach a result that was favorable to the plaintiff, his determination was well reasoned and supported by the substantial evidence in the record and was reached using the proper legal standard.

## **RECOMMENDATION**

Accordingly, for the foregoing reasons, it is the recommendation of the Magistrate that the decision of the Commissioner denying benefits be **AFFIRMED**, and that the claimant's complaint be **DISMISSED.**

Signed in Baton Rouge, Louisiana, on June 25, 2012

**MAGISTRATE JUDGE DOCIA L. DALBY**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**HELEN Y. MILLER**                        **CIVIL ACTION**

**VERSUS**                                    **NUMBER 11-275-JJB-DLD**

**MICHAEL J. ASTRUE, Commissioner**
**of Social Security**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have 14 (fourteen) days from date of receipt of this notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on June 25, 2012.

                                                   **MAGISTRATE JUDGE DOCIA L. DALBY**